UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RONALD DRAKE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil No. 09-616-B-W |
| | ) |
| WARDEN, MAINE STATE PRISON, | ) |
| | ) |
| Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION and
ORDER ON MOTION TO APPOINT COUNSEL**

Ronald Drake has filed a 28 U.S.C. § 2254 petition attacking his 1998 conviction for murder and robbery of Bradley Burnell which resulted in a thirty-nine-year sentence. Drake was convicted along with his co-defendant, Walter Hartford, after a joint trial that had separate juries. Burnell was severely beaten, robbed of prescription drugs that he was selling, and left at the bottom of an embankment. His body was found eleven days later. It is Drake's primary contention in his Section 2254 pleadings that it was Hartford who did the death-inducing beating. While Hartford had copious amounts of the victim's blood on the back and front of his jeans, the only blood found on Drake's attire was a splatter of blood on the backside of his left boot. While not contesting that this splatter was properly identified as Burnell's blood, Drake contends that this splatter was a result not of his contact with Burnell but of Drake's kicking the blood-soaked Hartford in an effort to distance himself from him.

Drake believes that a new round of DNA testing could demonstrate this version of events. In his reply memorandum Drake explains:

> Petitioner Drake[']s claims of exculpatory DNA evidence should be
> considered as a miscarriage of justice as the evidence was not presented to the

>Court or the jury to show that he, Petitioner Drake was NOT the primary actor who caused the death of the victim, in that petitioner Drake had only minimal blood smears on his boot, these were not blood splatter from hitting the victim, this was blood that was obtained from kicking his co-defendant in the leg, who happened to be covered in the victims[']s blood, which also was not shown to the jury, as that would have shown who the primary actor was.

(Reply Mem. at 3.) Drake complains that Hartford only received a thirty-five-year sentence on the murder conviction while Drake was sentenced to a longer term.[1]

The State's foremost argument for dismissal is that the federal petition is time-barred. The 28 U.S.C. § 2244(d) statute of limitations provision governing § 2254 petitions reads:

>**(d)(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>>**(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>**(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>**(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>**(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d).

With regards to § 2244(d)(1)(A), the Maine Law Court affirmed Drake's conviction on June 22, 1999. Drake did not file a petition for writ of certiorari with the United States Supreme Court so his conviction became final on September 20, 1999. On November 29, 1999, Drake filed a petition for post-conviction review which was denied on March 22, 2001, after an evidentiary hearing. He filed a notice of discretionary appeal from that denial, a request the Maine Law Court denied on May 7, 2001, see State v. Drake, 1999 ME 91, ¶¶ 4, 5, 731 A.2d

---

[1] There is no record evidence concerning Drake's sentencing other than the October 21, 2008, form judgment and commitment order. (See State App. Vol. II A.4.) There is no evidence of Hartford's sentence at all.

858, 860 -861.  Even not counting the more than two months that elapsed between the time Drake's conviction became final and the filing of his state-post conviction petition, Drake's § 2244(d)(1)(A) year ran long before he filed a January 5, 2007, motion seeking post-conviction DNA analysis with the state courts.  Based on § 2244 statute of limitations grounds alone, Drake is not entitled to 28 U.S.C. § 2254 review under the base-line year statute of limitations period set forth in § 2244(d)(1)(A).[2]

The State further argues that Drake is not entitled to 28 U.S.C. § 2254 review because he did not adequately exhaust this claim as required by 28 U.S.C. § 2254(b)(1).  This is probably a defensible position even though Drake did actually receive some state court review of this claim.[3]

I briefly reflect on the merits of his § 2254 claim partly because Drake filed a motion to appoint counsel in this case after he filed his reply to the State's answer indicating  that the issues involved are complex and he has limited knowledge of the law. (Mot. Appoint at 1, Doc. No. 14.)[4]  The following discussion should disabuse Drake of any notion that he might have succeeded in this Court but for the timeliness, exhaustion, and lack-of-legal representation concerns.

With regards to his 15 M.R.S. § 2138 efforts pertaining to DNA testing in state court, the statute limits access to the testing to those defendants meeting the following five criteria:

---

[2]     It is also evident that Drake's pursuit of a post-judgment conviction motion for DNA analysis under 15 M.R.S. § 2138 does not implicate subsections (B) through (D) of § 2244.  With respect to subsection (D) of § 2244, Drake did not succeed in getting new DNA testing so there are no new facts in support of his claim to federal relief from his conviction.

[3]     Anticipating that Drake might argue in objecting to this recommendation that the state process is somehow ineffective in protecting his rights, see § 2254(b)(ii), I do note that the holding of the majority in District Attorney's Office for Third Judicial Dist. v. Osborne, __ U.S. __, 129 S. Ct. 2308 (2009) certainly undermines such an argument.  See, e.g., id. at 2322  ("We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA.").

[4]     "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

3

> **4-A. Standard for ordering DNA analysis.** The court shall order DNA analysis if a person authorized under section 2137 presents prima facie evidence that:
> > **A.** A sample of the evidence is available for DNA analysis;
> > **B.** The evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way;
> > **C.** The evidence was not previously subjected to DNA analysis or, if previously analyzed, will be subject to DNA analysis technology that was not available when the person was convicted;
> > **D.** The identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person's trial; and
> > **E.** The evidence sought to be analyzed, or the additional information that the new technology is capable of providing regarding evidence sought to be reanalyzed, is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction.

15 M.R.S. § 2138(4-A). Drake, who had been appointed counsel, was rebuffed on May 7, 2009, in a Superior Court opinion that concluded that, even if Drake could satisfy the requirements of 15 M.R.S. § 2138(4-A) (A) through (D), his argument did not meet subsection (E). The court explained: "Identity of the defendant as a perpetrator of a crime is always an issue, even when a victim identifies the defendant as the only perpetrator of a crime, but the defendant denies the act or that no crime was committed, State v. Donovan, 2004 ME 81, ¶ 19, 853 A.2d 772, 776; however, Drake admitted his involvement and the evidence was sufficient for the jury to find at a minimum that he was an accomplice." (Order Denying Mot. New Trial at 2-3, State App. D.) The Maine Law Court denied Drake a certificate of probable cause on August 26, 2009. (Order Denying Certificate Probable Cause at 1, State App. D.)

A brief review of the trial record on this issue of blood spatter on Drake's boot demonstrates that Drake has no grounds for 28 U.S.C. § 2254 relief on the basis of his arguments he makes now to the federal court. His own testimony at trial was that Hartford came up with, and persisted with, the idea of rolling Burnell (Trial Tr. Vol. II at 549 – 53); that Hartford was the one who grabbed Burnell and commenced the beating (id. at 556); that when Hartford started

swinging at Burnell, Drake, not knowing what to do, also swung at him before he went over the embankment (id. at 557-59, 569); that Hartford immediately followed Burnell down the embankment and continued hitting him and then began going through his pockets (id. at 559-61); that Drake then went down to look for the pills in Burnell's front coat pockets (id. at 561, 571); that at this time Drake kicked Burnell and stole his pills (id. at 561, 571, 582, 584); and that while Hartford was still with Burnell, Drake went back up the slope and threw some ice or hard snow at the pair, purportedly to get Hartford's attention and alert him to the fact that he was leaving the scene, and that this frozen volley hit both men (id. at 561-62, 569, 572, 586).  On cross-examination Drake articulated that he figured out that he got blood on his boot when he kicked Hartford's leg.  (Id. at 588-89.)

     Hartford did not testify at trial (see id. at 523-24) and Drake's jury did not receive testimony or evidence concerning Hartford's taped police interview.   What Drake's jury did see was a videotaped confession by Drake.  I do not have the videotape or the transcript before me, but one of the officers participating in this interview described Drake's version of events as going "from no knowledge or involvement to…active participation in the beating of Mr. Burnell."  (Trial Tr. Vol. I at 372-73.)   He also described his about-face in this interview vis-à-vis taking the pills and throwing the ice.  (Id. at 373-74.)  The prosecutor described in her cross-examination of Drake as to his ultimate confession by the end of this lengthy interrogation as being along the lines of "well, we both got him down there, we beat the guy, we didn't mean to kill him, geez, what else do you need to know."  (Trial Tr. Vol. II at 578.)  Drake conceded that he could not be sure whether it was Hartford or him that sent Burnell over the embankment.  (Id. at 579-50.)

Drake seems to believe that a new DNA analysis would further his theory that he was much less culpable than his co-defendant despite the other evidence at trial. In his § 2254 petition Drake also contends that his counsel was ineffective because of a failure to hone in on the blood-splatter evidence which was much more damning vis-à-vis his co-defendant than it was to Drake. (Sec. 2254 Pet. at 8.)

The bottom line is that the theory that Drake now advances in the guise of his assertion of his right to new DNA analysis was key to the theory of his defense in his joint trial with Hartford. At trial there was no effort by the State to prove that Drake had more of the victim's blood on him than was confirmable by the DNA testing and which Drake still concedes was from the victim. The direct-examination testimony on the State's DNA analysis of Ronald Drake's clothing was as follows and does not suggest any vulnerability in the testing process:

> Q.  Now, first of all, let me ask you: With Ron Drake's Bean boot …
> ….
> You haven't examined it as a whole: you receive a sample?
> A.  I received a sample of swabbing from that boot, two actually.
> Q.  Why don't you explain for the … juries what you do with that sample that you receive?
> A.  With that, the blood swabbing sample, we'll take that into the laboratory, we'll perform an extraction technique which is basically a process to remove all the materials other than DNA … We then perform a series of tests to detect that DNA sample or DNA profile, we then compare it to the known DNA samples in this case.
> ….
> Q.  And with regards to the blood sample – how many samples did you do on the – how many samples did you receive from the left boot on Ron Drake?
> A.  Two samples.
> Q.  And – any – either of those or both of those profiles match anybody from your known samples?
> A.  Yes. One of those profiles from the boot matched Bradley Burnell.
> Q.  And did you do a statistical analysis on that?
> A.  Yes, I did.
> Q.  And what does that mean?
> A.  A statistical analysis is a mathematical calculation that we perform really to provide a means to the match, what does this match mean, how common or rare is this DNA profile.

Q. And what was the result of the analysis?
A. The result of this analysis, we estimated the probability of selecting an unrelated individual at random from the general Caucasian population to be approximately 1 in 2.79, 000 or 1 in 2800.
Q. Now in that analysis, sir, were you able to exclude Ron Drake or Walter Hartford as donors of the blood on the boot?
A. Yes, I could absolutely exclude.
….
The profile from the boot matched Bradley Burnell.
Q. You … received two samples from the boot, that would be two cuttings of blood?
A. Yes.
Q. What about with regard to the other sample?
A. The other sample we did not get a DNA profile from.
Q. Why might you not get a DNA profile?
A. Most likely there wasn't enough sample there. That's the most likely scenario. Another scenario may be there may have been something on that boot leather that either destroyed the DNA or somehow inhibited the DNA.
Q. Okay. So it – it still tested positive for blood: you just weren't able to get a DNA analysis from it?
A. Right.
Q. Now, did you test some other items of clothing belonging to Ron Drake?
A. Yes, I did.
….
Q. Okay. With regard to State's Exhibit No. 29, the Harley Davidson T-Shirt, you conducted a DNA test on the cutting from that T-Shirt?
A. Yes, I did.
Q. And what were your findings, sir?
A. Actually, I conducted two cuttings, DNA analysis on two cuttings. One of those cuttings matched Ronald Drake. The other cutting didn't get a DNA profile.
Q. Why is that?
A. Again I don't know. I wasn't able to extract any DNA.
Q. State Exhibit 27 …did you receive a cutting from this shirt?
A. Yes, I did.
Q. Did you perform DNA testing on that?
A. Yes, I did.
Q. What did you conclude?
A. Again, the DNA profile matched Drake, the owner of that shirt.
Q. With regards to … Rod Drake's blue jeans, did you obtain a …blood sample on this?
A. Yes, I obtained a cutting that had a blood sample on it.
Q. How many cuttings did you receive with regard to the jeans?
A. Just one.
Q. And what did your DNA testing conclude with regard to that, sir?

> A.    I obtained a DNA profile from those blue jeans; but, actually, it did not match any of the three known samples I tested in the laboratory.

(Trial Tr. Vol. III at 442-47.)  The DNA analyst then testified that he tested two cuttings from Hartford's jeans and found Bradley Burnell's profile on these in two different locations.  (Id. at 447.)  Drake's defense counsel on cross-examination then drove home the point that the analyst found only one potential match on Drake's physical evidence and that, per the first forensic evaluation of the blood, it was from a 3/16th inch stain on the left boot.  (Id. at 452.)  The analyst confirmed that there was no other blood on Mr. Drake that matched the victim.  (Id. at 452-53.)  He also confirmed that the cuttings from Hartford's jeans showed the victims blood on the front and back.  (Id. at 454.)

What is more, during the cross-examination of the investigating officer testifying to the chain of custody of this physical evidence, Drake's attorney questioned as follows:

> Q. Now, Detective Leighton, am I to assume that the exhibits that we have before us today are pretty much as you found them?
> A.    Yes.
> Q.    So, for example, if the – if it is determined that there is to be blood on the front of Mr. Hartford's jeans up to the front of the thigh area, we're to assume that that was the way they were when you found them?
> A.    Yes.
> Q.    And if, in fact, there was to be found – there was no blood of Bradley Burnell on any of Mr. Drake's clothing except a couple of spots on his left boot, are we to assume that's the way they were when you found them?
> A.    Yes, that's correct

(Id. at 406.)

In closing Drake's attorney stressed that  the "strongest part of Mr. Drake's case" was "the forensic witnesses of the State[.]" (id. at 693):

> They say, in essence, that although Mr. Hartford's jeans were effectively caked and coated in blood, there was a singular—Bradley Burnell's blood, there was a singular 3/16th's of an inch spot of Bradley Burnell's blood … on Ron Drake's left boot, not the front of the boot where one would expect you'd get it from kicking but here near the laces on the left-hand side, one spot of

>blood, laces, 3/16th's of an inch right here.  That's where it is, okay.
>Consistent with pushing the guy away, kicking him away, getting your shoe
>on his caked and coated pants.
>   And, ladies and gentlemen, it's not just significant that there was a spot
>here and there was not a spot here: but the very fact that there was a spot of
>Bradley Burnell's blood tell you that there was not effort to clean the boots.

(Id. at 693-94.)

In his 28 U.S.C. § 2254 pleadings Drake has not explained how renewed DNA testing could have altered the jury verdict.  Drake still admits that he was liable as an accomplice but maintains that he was not the primary actor and seems to believe his sentence reflects this misunderstanding.  In his Section 2254 petition he acknowledges:  "Maine enacted a law in which when a crime is committed the person who has committed the crime and any other person present are both equally guilty."  (Sec. 2255 Pet. at 6.)  In his reply memorandum he indicates: "Drake does not deny the fact of the case against him, what he does deny is the allegation that HE personally caused the death of Mr. Burnell."  (Reply Mem. at 1.)  Like the superior court, I cannot now perceive how renewed DNA testing and expert testimony thereon could assist Drake in advancing this claim in view of his testimony that he was indeed on the scene at the time of the initial beating of Burnell and that he did get a splatter of blood on the heel of his boot as a consequence of his contact with Hartford.  His trial attorney made every effort to convince the jury that the insubstantiality of the quantity of blood on Drake as compared to Hartford demonstrated Drake's unwillingness to participate in the beating and robbery.  However, the jury concluded that there was sufficient evidence against Drake to convict him of both counts.

Based on the above review I conclude that it would be futile to appoint counsel for Drake in this 28 U.S.C. § 2254 proceeding.  He may feel that the issues are complex but they are not. His 28 U.S.C. § 2254 petition was time-barred even before he initiated his attempt in the state courts for renewed DNA testing and there is no indication whatsoever that new testing would at

all advance his theory that he is factually innocent of his crimes of conviction given the evidence at trial described above.

## CONCLUSION

For these reasons I deny Drake's motion for the appointment of counsel and I recommend that the Court deny Drake 28 U.S.C. § 2254 relief. I further recommend that a certificate of appealability should not issue in the event Drake files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.
Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 28, 2010